UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| POLYFLOW, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:20-cv-00683 |
| | § | |
| SPECIALTY RTP, LLC and | § | |
| JOHN R. WRIGHT, JR., | § | |
| | § | |
| *Defendants*. | § | |

# FIRST AMENDED COMPLAINT

# (PUBLIC VERSION)

954369.5

# Table of Contents

I.     Jurisdiction and Venue................................................................................2

II.    Factual Background ...................................................................................3

    A.    Polyflow's products and services for the oil and gas industry................3

        1.    Polyflow's proprietary pipe, Thermoflex. .................................. 3

        2.    Polyflow's rehabilitation program, ExPERT. ............................. 4

    B.    Defendant Wright's work at Polyflow, and creation of defendant Specialty RTP. .........................................................................................................6

    C.    Defendants Specialty RTP and Wright copied Polyflow's products and business, and falsely represented the nature of Polyflow's business.....................9

        1.    Defendants copied the Polyflow products and business. ............................ 9

        2.    Defendants falsely represented the nature of Polyflow's business. .......... 12

    D.    The Lawsuit, Settlement Agreement, and Defendants' fraudulent inducement and failure to comply with the Settlement Agreement.....................15

III.    Claims for Relief......................................................................................20

    A.    Count One: Request for Order Compelling Defendants to Arbitrate ...................20

    B.    Count Two: Request for Order Designating and Appointing Arbitrator .............21

    C.    Count Three: Fraud in the Inducement of the Settlement Agreement.................22

    D.    Count Four: Material Breach of the Settlement Agreement ................................22

    E.    Count Five: Breach of Uniform Trade Secrets Act By Defendants.....................23

    F.    Count Six: Federal Unfair Competition (15 USC § 1125(a) and (b)) By Defendants .......................................................................................................24

    G.    Count Seven: Federal Unfair Competition (15 USC § 1125(c)) By Defendants .......................................................................................................26

    H.    Count Eight: Unfair Competition Under Texas Law By Defendants ...................27

    I.    Count Nine: Tortious Interference With Actual and Prospective Business Relationships By Defendants...............................................................................28

IV.    Prayer for Relief.......................................................................................29

954369.5

Plaintiff Polyflow LLC ("Polyflow") is a company manufacturing and installing reinforced thermoflex ("RTP") pipe. Defendant John R. Wright Jr. ("Wright") was an employee of Polyflow. After resigning his employment with Polyflow, Wright took Polyflow's confidential and trade secret information and started a competing company, Defendant Specialty RTP, LLC. Wright and Specialty RTP ("Defendants") used Polyflow's information, making wholesale copies of Polyflow's manuals, using Polyflow's proprietary models, and copying Polyflow's trade secret drawings to manufacture virtually identical reinforced thermoplastic pipe. Wright and Specialty RTP then misled potential customers, misled regulatory authorities, and even made false statements to a federal court about their activities.

To resolve the federal court lawsuit filed by Polyflow, Wright and Specialty RTP signed a settlement agreement, Exhibit A, in which they agreed: (1) not to use Polyflow's confidential and trade secret information; (2) not to manufacture Protected RTP for two years; and (3) not to use or provide specific types of Polyflow information to vendors concerning design or manufacturing process for reinforced thermoplastic pipe. But Wright and Specialty RTP did not comply, and apparently never intended to comply with the settlement agreement.  Wright and Specialty RTP boasted internally that they had put one over on Polyflow, continued to provide technical manufacturing and design assistance to vendors who had not manufactured or designed this type of reinforced thermoplastic pipe, and knowingly and intentionally provided false information to third parties concerning their intentional breaches of the settlement agreement.

Plaintiff Polyflow, LLC seeks an order that its arbitration demand against Defendants Specialty RTP, LLC ("Specialty RTP") and John R. Wright, Jr. ("Wright") (collectively "Defendants") proceed and for the appointment of an arbitrator, as provided by the Federal

Arbitration Act and the Texas Arbitration Act.  In the alternative, Polyflow asserts each of its causes of action against Defendants for resolution in and by this Court.

## I.     JURISDICTION AND VENUE

1.      This action arises under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. and the Texas Arbitration Act, Tex. Civ. Prac. & Rem. Code § 171.001 *et seq*.  To the extent the Court determines that any of Polyflow's claims are not subject to mandatory arbitration, this action arises under 28 U.S.C. §§ 1331, 1332, and 1367.

2.      Polyflow is a limited liability company organized under the laws of the State of Delaware that maintains its principal place of business in Texas.

3.      Defendant Specialty RTP, LLC is a Delaware limited liability company created by Defendant John R. Wright, Jr. and has a place of business in Pennsylvania, listing on its commercial communications its address as 12 S Bacton Hill Rd #1, Malvern Pennsylvania 19355.  Defendant Wright also has represented to industry participants that Specialty RTP has a manufacturing location in or near Houston, Texas.  The registered agent for Specialty RTP is BlumbergExcelsior Corporate Services, Inc., 725 Decker Prairie Drive, Austin, Texas 78748. Specialty RTP has appeared and can be served this First Amended Complaint through its counsel.

4.      Defendant John R. Wright, Jr. is an individual residing at and can be served at 172 Beaumont Road, Devon, Pennsylvania 19333.  Defendant Wright is believed to be the sole member of and also an officer of Defendant Specialty RTP.  Wright has appeared and can be served this First Amended Complaint through his counsel.

5.      This Court has personal jurisdiction over Specialty RTP and Wright because each: (1) transacts business in this state; (2) is believed to maintain a business location in this state, in or near Houston; (3) engages in false and deceptive forms of advertising in this state, (4) engages

2

954369.5

in wrongful acts inside this state; and/or (5) engages in wrongful acts outside this state that have caused harm in this state. Specialty RTP and Wright also entered into a settlement agreement in Texas that is governed by the laws of Texas, and that provides for a Harris County, Texas venue. Ex. A (filed separately under seal).

6.      The Court has subject matter jurisdiction over this case pursuant to 9 U.S.C. § 1 , 28 U.S.C. §§ 1331 (diversity, with the amount in controversy more than $75,000) and 1332 (federal question, e.g., the Lanham Act claims), as well as 28 U.S.C. § 1367 (supplemental for any state claims).

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, as well as the settlement agreement signed by Polyflow and Defendants.

## II.      FACTUAL BACKGROUND

**A.      Polyflow's products and services for the oil and gas industry.**

8.      Plaintiff Polyflow develops, manufactures, and sells products and services for the interstate oil and gas industry.  Polyflow began operating in April 2011.

9.      In particular, Polyflow manufactures and sells a line of reinforced thermoplastic pipe ("RTP pipe") specially formulated for use in modern oil and gas production.  Polyflow's products are marketed and sold under the registered tradename and mark of Thermoflex.

**1.      Polyflow's proprietary pipe, Thermoflex.**

10.      Polyflow's Thermoflex product offers the strength of steel with superior durability.  It is a flexible choice for fluid transport, is lightweight in construction, and its long lengths make it a low-cost, easy-to-install, versatile pipe for use in a variety of applications.

11.      Below is a diagram of Polyflow's Thermoflex product:

954369.5



The inert proprietary inner liner is a hydrocarbon-resistant barrier—also resistant to H2S and CO2—that exhibits low permeation.

The center layer provides high temperature strength.

The aramid fiber reinforcement—using a proprietary weave—provides for strength and high tensile load.

The outer jacket is an abrasion-resistant cover to protect the braids.

**Polyflow's Thermoflex piping uses proprietary multilayer polymer construction.**

12.     The commercial advantages of Polyflow's Thermoflex product include: (1) being lightweight for low-cost installation (no welding necessary; 85% lighter than steel; inexpensive installation equipment; jointless splice connections); (2) corrosion resistance (nylon and PPS for hydrocarbon resistance, H2S and CO2 environments and no cathodic protection necessary); and (3) reduced pressure drop (smaller diameter with same pressure drop as steel and less loads on pumps and compressors).

**2.      Polyflow's rehabilitation program, ExPERT.**

13.     In addition to providing pipe, Polyflow also rehabilitates old steel pipe. Polyflow's rehabilitation program is called ExPERT, which stands for Existing Pipe Enhanced Rehabilitation Technologies. There are three key components of ExPERT: Polyflow's Thermoflex pipe, Polyflow's registered tradename and marked PullThru installation process, and Polyflow's skilled engineering team.

954369.5

14.     When the steel piping becomes corroded or damaged, Polyflow can quickly and easily prevent further damage and downtime by inserting an inner tube with the PullThru process.  A general diagram showing the PullThru process from Polyflow's website:



15.     By example, Polyflow's ExPERT rehabilitation program has remediated a leaking pipe of multiple widths (4, 6 and 8 inches), with a length of almost three miles, in the Gulf of Mexico.  A case study of this project can be found at Polyflow's website, http://expert .polyflowglobal.com/wp-content/uploads/Gulf_of_Mexico_Pull_Through.pdf.

16.     Polyflow has been and remains engaged in rehabilitation work.  The first project was for Hilcorp in Louisiana, where 3.5-inch Thermoflex pipe was pulled inside of 6-inch steel. The first significant offshore project was for Crescent Petroleum in the United Arab Emirates, pulling 3.5-inch Thermoflex pipe through 8-inch Coflexip line. Polyflow also has done rehabilitation work for companies like Chevron and Hunt Oil. During 2014, Polyflow was involved before and after Wright's departure in a significant rehabilitation project for Petronas. Polyflow also was engaged in evaluating and bidding potential rehabilitation work for companies throughout 2014, including potential projects for companies like Exxon, Fieldwood Energy, OXY, OMV, Saipem, and Pertamina. Also during 2014, Polyflow further developed its rehabilitation work by hiring a marketing company to assist in the naming (ExPERT) and development of the rehabilitation business, as well as the development of a new website for ExPERT. Polyflow presented its ExPERT rehabilitation services at an International Sales Meeting for actual and potential customers in May 2014.  Throughout 2014, Polyflow, through

954369.5

Mr. Wright, also had discussions with Exxon about potential rehabilitation projects, including meetings in September and October 2014, just weeks before Mr. Wright left Polyflow. These meetings occurred in Houston with employees of Exxon's Upstream Research Company.

17.     The benefits of using Polyflow's ExPERT PullThru process include: (1) dramatically reduced costs versus new steel; (2) reduced lead time and down time; (3) long-term corrosion resistance for offshore applications; and (4) minimal disturbance of the seabed.

**B.     Defendant Wright's work at Polyflow, and creation of defendant Specialty RTP.**

18.     Defendant Wright is a former president of Polyflow. Wright signed an employment agreement with Polyflow on April 29, 2011 (the "Employment Agreement").

19.     Wright's employment contract was effective April 29, 2011, and was effective for two years. Wright chose to terminate the employment agreement after two years without good reason, on April 29, 2013.

20.     Polyflow and Wright then discussed the terms of Wright's continued employment at Polyflow.

21.     By letter agreement dated July 15, 2013, Polyflow and Wright agreed to continue Wright's employment relationship with Polyflow.

22.     The letter agreement provides that "all terms of the Employment Agreement that survive the termination of that agreement shall remain in effect." According to Article 10.10 of the Employment Agreement, the surviving terms are Articles V-VIII, which are Effect of Termination of Employment on Compensation (V), Protection of Information (VI), Statements Concerning the Company and Executive (VII), and Non-Competition Agreement (VIII). The other provisions of the Employment Agreement did not survive. Wright undertook and extended these obligations by his execution of the letter agreement.

23.     Article VI of the Employment Agreement, Protection of Information, as incorporated into the letter agreement, provides that Wright will not disclose or use any Confidential Information and Work Product "during the term of his employment or within five years after the termination of Executive's employment with the Company [Polyflow]…."

24.     Article VII of the Employment Agreement, Statements Concerning the Company and Executive, as incorporated into the letter agreement, prevents Wright from making any of the following statements: "that (a) are slanderous, libelous, or defamatory, (b) disclose Confidential Information of the Company [Polyflow], or (c) place the Company in a false light before the public."

25.     Article VIII of the Employment Agreement, Non-Competition Agreement, as incorporated into the letter agreement, prohibits Wright from competing against Polyflow for two years: Wright agreed that "(i) he will refrain from carrying on or engaging in, directly or indirectly, any Competing Business in the Restricted Area and (ii) he will not, directly or indirectly, own, manage, operate, join, become an employee, independent contractor, consultant or advisor of, or otherwise provide services to, control or participate in any business, individual, partnership, firm, corporation or other entity which carries on or engages in any Competing Business in the Restricted Area" and further that Wright will not "canvass, solicit, approach or entice away or cause to be canvassed, solicited, approached or enticed away from the Company [Polyflow] any of the company's [Polyflow's] customers with whom Executive had contact on behalf of the Company [Polyflow] during the last 12 months of Executive's employment with the Company [Polyflow] or prospective customers about whom Executive received or learned of any Confidential Information during the last 12 months of Executive's employment with the Company [Polyflow]."

26.     Moreover, Wright's July 15, 2013 letter agreement provides that: "In the course of your continued employment, you will be expected to comply with all of the Company's [Polyflow's] policies and procedures as may be issued from time to time."  Wright executed the letter agreement, agreeing to be bound to the Polyflow policies and procedures, including the employee handbook.

27.     The Polyflow employee handbook (Section 3.06) allows employees to engage in outside employment, but not if the outside employment interferes with the employee's performance of the employee's duties to Polyflow, is not competitive with the business activities of Polyflow, and does not involve a possible conflict of interest with Polyflow. The outside employment must be approved in writing by the Polyflow CEO.

28.     The employee handbook (Section 4.03) also proscribes Conflicts of Interest, stating:

> Employees have an obligation to conduct business within guidelines that prohibit actual or potential conflicts of interest.  Employees should avoid any situation which involves or may involve a conflict between their personal interest and the interest of the Company.  You must never use your position with the Company or any of its customers, for private gain, to advance personal interests or to obtain favors or benefits for yourself, members of your immediate family or any other individuals, corporations or business entities.

> You should always conduct your personal affairs in such a fashion that your duties and responsibilities to the Company are not jeopardized and/or legal questions do not arise with respect to your association or work with the Company.

> If a conflict of interest may occur, report the situation to your supervisor or CEO immediately.

29.     The employee handbook (Section 4.04) further states that "Company [Polyflow] materials, ideas and information are Company [Polyflow] property and should never be given to an outside organization or individual except through normal channels and with appropriate authorizations." It provides examples of protected confidential information, including "new

954369.5

materials research" "proprietary production processes," "technological data and prototypes," "customer preferences," and "current or pending contracts, projects or proposals." The employee handbook provides that an employee is subject to immediate discharge for "knowingly disclosing confidential Company information to unauthorized persons."  It even says that if the employee has questions regarding what is or is not confidential, "please treat the information as confidential until you are able to speak to your supervisor or the CEO for clarification."

30.     Wright resigned from Polyflow on October 24, 2014.

31.     Upon termination of employment, the employee handbook makes clear that all materials must be returned to Polyflow, and further reminds the employees of their obligation to not use or disclose confidential or proprietary information: "Please also remember your obligations regarding the safekeeping of Company [Polyflow] and customer confidential and proprietary information once you leave the Company [Polyflow]."

**C.     Defendants Specialty RTP and Wright copied Polyflow's products and business, and falsely represented the nature of Polyflow's business.**

32.     Defendants went into business immediately following Wright's departure from Polyflow in October 2014, copying the Polyflow products and business, and misinforming the interstate marketplace about their relationship to Polyflow and the nature of Polyflow's business.

33.     Polyflow was the only market participant making the type of multi-layer pipe that Defendants improperly copied and used in competition with Polyflow.

**1.     Defendants copied the Polyflow products and business.**

34.     Defendant Wright, as a former Polyflow executive and also a chemical engineer who was aware of the Polyflow products and processes, knew Polyflow's confidential and proprietary information.  For example, Wright knew the proprietary composition and manner of producing Thermoflex pipe.

954369.5

35.     Wright created a company, Specialty RTP, to compete with Polyflow.

36.     By less than a month after he resigned, in early November 2014, Wright had changed his email to jwright@specialtyrtp.com, and had contacted a customer of Polyflow, Petronas, with whom he had contact in his final year of employment and about whom he knew Confidential Information and Work Product. Specialty RTP was and is a competitor of Polyflow, with its purpose being to "provide oil and gas companies a way to continue to operate their mature fields through low cost rehabilitation."

37.     At that time, Wright was wrongfully taking the position that he was not bound by any non-compete or confidentiality agreement.

38.     Wright attempted to get Polyflow to sell Defendants the Polyflow Thermoflex pipe for Defendants' use on their potential projects, such as Exxon's Alabama project, in the spring of 2015.  Polyflow provided conditions to Defendants for the sale of Thermoflex pipe, and Defendants did not satisfy those conditions for purchasing Thermoflex pipe. Polyflow then decided that it would not sell to Defendants.

39.     Defendants' response was to begin manufacturing their own pipe, misuing Polyflow information.  In early March 2015, by example, Defendants were contacting companies such as BASF to potentially obtain raw materials for their pipe.  BASF, confused as to the source of the request for raw materials, contacted Polyflow regarding Defendants' request for raw materials. Defendants were using the Polyflow proprietary materials and processes for their own pipe.

40.     There are at least three important components to making the Thermoflex pipe: the base material composition, the configuration of the braid, and the pitch and angle of the braid onto the pipe.

954369.5

41.     Defendants used Polyflow's proprietary base material composition. Defendants have no history of independently making pipe. Defendants apparently began making pipe at some time in early 2015, approximately 6-9 months after Wright left Polyflow.

42.     At the same time that Defendants first began making their pipe, they presented to Exxon technical data and test results allegedly showing the capabilities of the pipe that they would provide to Exxon. This testing data was for Polyflow's Thermoflex pipe. Wright had not created any pipe of his own, nor had he conducted any testing of any pipe that was made without Polyflow information.

43.     Polyflow's products had been developed and tested over several years to ensure that they meet performance acceptance criteria. Polyflow's testing is done by an outside laboratory.  The time to develop sufficient data regarding a pipe's performance characteristics is 18 months. The testing requires 10,000 hours (minimum 416 days) of pipe performance. Defendants had not had sufficient time to develop and properly test a competing product since Wright left Polyflow.

44.     Defendants were using the same base material composition and improperly appropriating Polyflow's confidential and proprietary information.

45.     Defendants also were having the braid made in the same manner as the Polyflow Thermoflex braid. From an email inadvertently sent to Wright's old Polyflow email, Polyflow learned that Defendants ordered from Beaver Manufacturing Company, Inc. ("Beaver") the same braid configuration that Polyflow developed.

46.     Polyflow previously had evaluated Beaver to make its braid, and provided its information pursuant to a non-disclosure agreement.  Polyflow eventually determined to obtain

its supply of braid from another company.  Beaver, though, had the ability to make Polyflow's braid.

47.     Defendants' purchase order with Beaver shows that Defendants would pick up the order at Umbilicals International, 10711 Cash Ave., Stafford, Texas 77477. Defendants provided Umbilicals International with Polyflow proprietary and trade secret information in order to teach Umbilicals International how to manufacture Polyflow's pipe, including the knowledge and know-how for wrapping braid at a particular pitch and angle around a base pipe and covering the finished product with a protective coating. Umbilicals International had no previous experience manufacturing Polyflow's type of reinforced thermoplastic pipe.

48.     From another email accidently sent to Wright's old Polyflow email, it is clear that Wright used his knowledge of Polyflow pricing for Specialty RTP's order from Beaver.  In the email, Wright asked Beaver "to confirm the pricing.  I put in 14.00 because that was a Polyflow Price."

49.     Defendants also provided Polyflow proprietary and trade secret information to Teel Plastics in Wisconsin, which then manufactured the base pipe for Defendants.

50.     Defendants also are believed, based upon another email mistakenly sent to Wright at his former Polyflow email address, to have made and used the same coupling to connect the sections of pipe, and also used a Polyflow swaging machine to install the couplings.

51.     With the same raw materials and braid, and Wright's knowledge of Polyflow's engineering model to convert braid and place it onto pipe, Defendants have the ability to replicate and did replicate Polyflow's Thermoflex pipe.

**2.      Defendants falsely represented the nature of Polyflow's business.**

52.     Many of Polyflow's customers and prospective customers maintain headquarters, facilities, personnel and/or operations in the United States, including in Texas. By example,

954369.5

Exxon's main office and its head engineer in charge of the Alabama project are located in Houston and this district, at ExxonMobil Upstream Research Company, 3120 Buffalo Speedway, Houston, Texas 77098.

53.     These same customers and prospective customers of Polyflow have operations in Texas, including this district, and worldwide.

54.     Wright and Specialty RTP are now competitors of Polyflow in the sale of pipe and rehabilitation projects.

55.     Wright and Specialty RTP were engaged and are currently engaged in a campaign that uses false or misleading descriptions of fact and/or false or misleading representations of fact, which misrepresent the true nature, characteristics and qualities of both Polyflow's and Specialty RTP's products, and also the nature of the relationship between them.  Defendants also are placing Polyflow in a false light within the industry.

56.     Defendants have made the following false or misleading descriptions of fact and/or false or misleading representations of fact, which misrepresent the true nature, characteristics and/or qualities of Polyflow's products and business plans, including, but not limited to:

a.     Before the Settlement Agreement, Defendants provided false and/or misleading information to the marketplace and industry participants regarding Polyflow's business plans.  For example, within days after leaving Polyflow, Defendants were telling market participants, such as Petronas, Oxy, and Exxon that Polyflow was not pursuing rehabilitation programs, but that Defendants would provide such services.  By May 2015, Defendants also had made the representation to Exxon that Polyflow was no longer engaged in rehabilitation projects, that both of Polyflow's plants were shut down and that Polyflow had agreed that Defendants had permission to provide rehabilitation services rather than Polyflow.

b.     Before the Settlement Agreement, Defendants provided false and/or misleading information to the marketplace and industry participants regarding Polyflow's business capabilities.  For example, again within days after Wright left Polyflow, Defendants were telling market participants, such as Petronas, Oxy, and Exxon that Polyflow was lacking talent for the installation of pipe, but that Defendants

954369.5

had such talents.  Wright also told representatives for the Dulang project that he saw no one at Polyflow capable of doing the installation.  These statements are contrary to Wright's admissions to Polyflow in contemporaneous correspondence.  Defendants also told Exxon in May that Polyflow's plants were shutdown.

c.      Before the Settlement Agreement, Defendants have provided false and/or misleading information to the marketplace and industry participants regarding the nature of their relationship to Polyflow by not clarifying that they are actually competitors, but instead by stating or misleading the marketplace into believing that Defendants have some type of agreed relationship with Polyflow.  By example, in connection to the Exxon project in Alabama, Defendants told the Department of Transportation that Specialty RTP was a spinoff of Polyflow, and when asked to further clarify the relationship, reinforcing the misperception of a continuing relationship by stating that Wright has a stake in Polyflow.  Defendants further misled the marketplace and industry participants regarding the relationship between Polyflow and Specialty RTP by using Polyflow's business materials.  For example, Defendants submitted Polyflow's installation manual to the Pipeline and Hazardous Materials Safety Administration, causing the Pipeline and Hazardous Materials Safety Administration to believe that Polyflow was involved in that Exxon project in Alabama with Specialty RTP.

d.      Before the Settlement Agreement, Defendants provided false and/or misleading information to the marketplace and industry participants regarding the nature of their products by providing Polyflow's technical information and testing data results to Exxon with respect to the project in Alabama.

57.     The foregoing statements and representations of fact are false and/or materially misleading.  They also place Polyflow in a false light.

58.     Defendants also misappropriated and caused confusion regarding their business and Polyflow by submitting Polyflow's installation manual and confidential engineering drawing to the Pipeline and Hazardous Waste Materials Safety Administration for the Defendants' project in Alabama.  The Pipeline and Hazardous Waste Materials Safety Administration, believing that Polyflow was involved in the project, called Polyflow for clarification of the submitted information.  Polyflow's installation manual is clearly labelled as a Polyflow document, contains Polyflow's trademark and also contains Polyflow's trade dress.  Defendants copied Polyflow's engineering drawing, removing the Polyflow name and confidentiality designation to deceive

14

any recipients about the drawings true source. Defendants did not have permission to use Polyflow's corporate documents or drawings.

**D.      The Lawsuit, Settlement Agreement, and Defendants' fraudulent inducement and failure to comply with the Settlement Agreement.**

59.      Because of Defendants' malfeasance set forth above, Polyflow brought a lawsuit against Defendants styled *Polyflow LLC v. Specialty RTP LLC and John R. Wright, Jr.*, Case No. 15-02817, in the United States District Court for the Southern District of Texas ("the Lawsuit").

60.      The parties eventually settled the Lawsuit under the terms of a Settlement Agreement with an effective date of February 24, 2017.  Exhibit 1.

61.      In the Settlement Agreement, Defendants agreed that ███████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████ Settlement Agreement, ¶¶ B.2.a. and B.2.b. The purpose of these provisions was that Defendants would purge their Polyflow material and then take the time to independently develop their own product.  Polyflow has since learned that Defendants not only have not complied, but never intended to comply with these provisions of the Settlement Agreement.  Defendants now are taking the position that ███████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ That position is inconsistent with both the language and intent of the Settlement Agreement, and is evidence that Defendants never intended to comply with the Settlement Agreement. Polyflow has learned that Defendants ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████

954369.5

███████████████████████████████████████████████████████

████████████████████████████████████

62.     Defendants also agreed that they would not use or disclose certain types of Polyflow information and materials both during and after the manufacturing ban. Settlement Agreement, ¶¶ B.1.a.-j.  The purpose of these provisions was to again prevent Defendants from using their knowledge of Polyflow information and materials, and to force them to independently develop their own product.  But Defendants have continued to use Polyflow information and materials.  By example, Defendants ████████████████████████████████████████

███████████████████████████████████████████████████████

Defendants have copied or maintained copies of Polyflow testing guidelines and instructions, Polyflow test results, Polyflow technical manuals, Polyflow case studies and photographs, Polyflow drawings, and Polyflow modelling programs.  Defendants continue to use this Polyflow information to compete unfairly with Polyflow.

63.     In fact, less than a month after signing the Settlement Agreement, Defendants were again copying Polyflow information, placing the SRTP logo on it, and providing the information to customers as if the information had been generated originally by Defendants. Similarly,  Defendants  ██████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████  In addition, Defendants materially

954369.5

breached the Settlement Agreement by ███████████████████████████████████
████████████████████████████████

64.     The Settlement Agreement provides that ██████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████████████████ Settlement Agreement, ¶ B.2.c. Defendants were required █
███████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ *Id.* at

¶ B.2.d.  These provisions were included to ensure that Defendants accurately informed potential manufacturers and suppliers of Defendants' obligations, and to allow those manufacturers and suppliers to determine for themselves whether they could do what was asked by Defendants. Defendants did not timely comply with these obligations.

65.     The Settlement Agreement unambiguously provides that Defendants were to
███████████████████████████████████████████████████████████████████████
████████████████████████████████████████ Settlement Agreement, ¶ B.2.f.
Defendants then were to ██████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████ *Id.*  Polyflow has
learned that Defendants ████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████  Moreover, Defendants did not ████████████████████████████
███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

66.    The Settlement Agreement further provides that the parties will ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████    Settlement Agreement, ¶ B.4.a. That language was included to ensure that Defendants did not continue to have and use the information that they were prohibited from having or using in the future. Defendants, though, made no attempt to comply with this provision, and on information and belief, continue to use Polyflow's information.  Defendants now appear to be taking the position ███████████████████████████████████████

████████████████████  That is contrary to the language and intent of the Settlement Agreement, and further evidence that Defendants had no intent of complying with the Settlement Agreement.

67.    The Settlement Agreement also provides that ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  Settlement Agreement, ¶ B.5.a,  This provision was added to ensure that all future pipe would be reviewed for compliance with the Settlement Agreement. Polyflow has learned that ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Defendants also intentionally ████████████████████████

████████████████████████████████  Defendants have always

18

██████████████████████████████████████████████████████████

███████████████████████████ Again, Defendants have knowingly and intentionally violated the Settlement Agreement.

68.     The Settlement Agreement also contained a confidentiality provision that limited what the parties could say regarding the settlement. Settlement Agreement, ¶ C.1.a and C.1.b. Since the Settlement Agreement, Defendants have made statements beyond the allowed scope, and also have continued to provide false and misleading information to Polyflow's actual and potential customers regarding the Settlement Agreement.  First, Defendants have falsely ██████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Second, Defendants have falsely represented to at least one Polyflow customer that █████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████ Third, Defendants have falsely represented that ██████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

69.     Defendants' intentional and knowing violation of almost every provision of the Settlement Agreement addressing and presumably protecting Polyflow's interests, as well as

Defendants continued false and misleading statements in the marketplace, are evidence that Defendants not only have failed to comply with the Settlement Agreement, but in fact never intended to comply with the Settlement Agreement.

### III.    CLAIMS FOR RELIEF

70.    Defendants' actions have harmed Polyflow in the marketplace, forcing Polyflow to bring the following causes of action.  Polyflow incorporates all of its Factual Background allegations into each count and cause of action.  Polyflow primarily seeks to compel arbitration as set forth in Counts One and Two, but to the extent that the Court finds any of the affirmative causes of action should not be sent to arbitration, alternatively affirmatively asserts, as applicable, Counts Three through Nine.

### A.    COUNT ONE: REQUEST FOR ORDER COMPELLING DEFENDANTS TO ARBITRATE

71.    Polyflow and Defendants entered into a valid and enforceable arbitration agreement contained in the parties' Settlement Agreement.  Ex. A.

72.    Polyflow has made a demand for arbitration on Defendants. Polyflow made its arbitration demand on Defendants on September 16, 2019.  The parties then negotiated ways to try and resolve their disputes that were unsuccessful, and Polyflow continued to request that Defendants confer and agree to a self-administered arbitration process.

73.    Defendants have failed and refused to arbitrate under the terms of the Settlement Agreement, and although agreeing in principle to arbitrate, have failed to confer substantively with Polyflow regarding the self-administered arbitration terms and conditions.  Defendants instead have most recently suggested an American Arbitration Association administered process, which is inconsistent with the terms of the Settlement Agreement, or the appointment by the Court of an arbitrator.   Polyflow therefore files its complaint to compel arbitration.

74.     Pursuant to 9 U.S.C. § 4 and Texas Civil Practice & Remedies Code § 171.086, the Court should issue an order compelling Defendants to proceed with the arbitration under the terms of the Settlement Agreement.

**B.     COUNT TWO: REQUEST FOR ORDER DESIGNATING AND APPOINTING ARBITRATOR**

75.     Polyflow and Defendants entered into a valid and enforceable arbitration agreement contained in the parties' Settlement Agreement. The parties have communicated since September 16, 2019, and Defendants have agreed in principle that the parties' disputes should be arbitrated.

76.     The arbitration agreement does not specifically identify the method for the naming or appointing of an arbitrator. The parties at the time of the Settlement Agreement contemplated agreement on an arbitrator. In the absence of an agreement, the parties contemplated the appointment of an arbitrator by the Court. Polyflow now seeks such appointment.

77.     Polyflow first suggested to Defendants that Karl Bayer, a Texas attorney experienced in arbitrating, serve as arbitrator.  Defendants rejected Mr. Bayer.  Thereafter, the parties exchanged a list of three potential arbitrators each in October 2019, and both Polyflow and Defendants identified Susan Soussan as a potential arbitrator, subject to her agreement and availability to act as arbitrator.  However, Defendants no longer agree to the appointment of Susan Soussan as the arbitrator.

78.     Defendants have refused to respond substantively to Polyflow's proposal for self-administered arbitration, including Karl Bayer as arbitrator, and then withdrew their agreement to Susan Soussan as the potential arbitrator. Polyflow and Defendants agree, though, that the Court can appoint an arbitrator, and Polyflow therefore requests such appointment.

21

79.     Pursuant to 9 U.S.C. § 5 and Texas Civil Practice & Remedies Code § 171.041, the Court should designate and appoint an arbitrator to conduct the arbitration required under Polyflow's Settlement Agreement with Defendants.

## C.   COUNT THREE: FRAUD IN THE INDUCEMENT OF THE SETTLEMENT AGREEMENT

80.     As set forth above, Defendants made representations in the Settlement Agreement that were material to Polyflow's agreement to the Settlement Agreement. Defendants' representations were false. Defendants were aware of and intended that Polyflow rely upon these misrepresentations, and Polyflow did in fact rely upon the misrepresentations, which have caused significant damage to Polyflow.

81.     The arbitration clause, though, was not induced by fraud.

82.     Polyflow seeks all of its actual damages, including but not limited to lost profits, and because Defendants fraudulently induced Polyflow into the Settlement Agreement, with malice, knowledge and intent, Defendants also are liable for exemplary damages.

## D.   COUNT FOUR: MATERIAL BREACH OF THE SETTLEMENT AGREEMENT

83.     As set forth above, Defendants have materially breached the Settlement Agreement.  Their breach goes to the essence of the Settlement Agreement.

84.     Polyflow has been damaged by Defendants' breaches in an amount to be determined by the finder of fact under the applicable law.

85.     Polyflow seeks its actual damages, as well as (if allowed) its attorney fees and costs.  As a result of Defendants' actions, Polyflow was required to retain counsel to prosecute this claim.  Polyflow should recover its reasonable and necessary attorneys' fees, costs, and all expenses from Defendants. All conditions precedent have occurred or have been waived or have been frustrated by Defendants' actions.

954369.5

E.      **COUNT FIVE: BREACH OF UNIFORM TRADE SECRETS ACT BY DEFENDANTS**

86.     Polyflow's confidential and trade secret information, including trade secret information about its proprietary Thermoflex product, its customer preferences, and its pricing from suppliers, derives independent economic value from not being generally known to and readily ascertainable by proper means by others who could obtain economic value from its disclosure or use.

87.     Polyflow has taken reasonable steps to maintain the secrecy of this information, including but not limited to by not disclosing it outside of Polyflow, by implementing policies concerning the treatment of confidential information and requiring employees to agree to protect such information both during and after employment, and by limiting access to the information through use of computer passwords, access lists, and physically restricting access to workspaces.

88.     Defendants have disclosed or used this Polyflow information constituting trade secrets without the consent of Polyflow, by example improperly making Polyflow's Thermoflex pipe by using confidential and proprietary information regarding the composition and process for making the Thermoflex pipe, pitching Polyflow customers based on known preferences, also using Polyflow's pricing information for its suppliers.  Defendants knew that Wright was under a duty to maintain the secrecy of and not to use the information in his possession.

89.     As a result of Defendants' misappropriation, Polyflow has suffered actual damages, including attorney's fees, expenses, and costs.

90.     Defendants' misappropriation was willful and malicious, as evidenced by their knowledge of the confidential and proprietary nature of the information, and intentional misappropriation of such information.

954369.5

91.     Because Defendants' actions constitute a continuing threatened misappropriation of Polyflow's trade secrets, the arbitrator should enjoin Defendants to prevent Defendants from further using or disclosing any of Polyflow's trade secrets.

92.     Polyflow seeks its actual damages, as well as its attorney fees and costs, including under Chapter 134A of the Texas Civil Practice & Remedies Code because of Defendants' willful and malicious misappropriation.

93.     All conditions precedent have occurred or have been waived or frustrated by Defendants' actions.

## F.     COUNT SIX: FEDERAL UNFAIR COMPETITION (15 USC § 1125(a) AND (b)) BY DEFENDANTS

94.     Defendants' promotion, offering for sale, and sale of goods using the Polyflow trademarks, both registered and available at common law, constitute false designations of origin and false descriptions or representations that Defendants' competing products are authorized by or equivalent to Polyflow's products and services. They are not. Defendants also have used Polyflow information to pass off their products as being the equivalent of Polyflow's products. Such improper conduct by Defendants limits Polyflow's ability to make sales and also to protect the integrity and reputation of its products and services in the marketplace.

95.     Defendants also are engaged in commercial advertising and/or promotion that disparages Polyflow and its business and products.

96.     A central feature of Defendants' campaign is the use of false or misleading descriptions of fact and/or false or misleading representations of fact, which places Polyflow in a false light and misrepresents the true nature, characteristics and/or qualities of Polyflow's business and products. These representations include, as set forth above and without limitation, all of the foregoing:

a. Defendants have provided false and/or misleading information to the marketplace and industry participants regarding the nature of their relationship to Polyflow.

b. Defendants have provided false and/or misleading information to the marketplace and industry participants regarding the nature of their products by providing Polyflow's products, technical information and testing data results as their own.

c. Defendants have provided false and/or misleading information to the marketplace and industry participants by falsely representing the terms and scope of the Settlement Agreement.

97. Defendants' false and misleading advertising campaign has the capacity to deceive and is designed to deceive, and has deceived, the public.

98. Defendants' false and misleading descriptions, representations and assertions are material because they are likely to influence purchasing decisions; indeed, that is their design and purpose.

99. Defendants' acts constitute false or misleading descriptions of fact or false or misleading representations of fact in connection with commercial advertising and/or promotion of goods, and further misrepresent the nature, characteristics and/or qualities of goods, all in violation of Section 43(a)(1)(A) and (B) of the Lanham Act, 15 U.S.C. § 1125.

100. Polyflow has been damaged by the illegal acts of Defendants, and will continue to be damaged unless and until Defendants are enjoined.

101. Polyflow is entitled to recover: (1) the wrongfully gained profits of Defendants, (2) damages that compensate the harm suffered as a result of Defendants' illegal conduct, and (3) the costs of this action.

102. In awarding damages, the arbitrator should treble the damage award to Polyflow because Defendants' acts were purposeful, knowing and willful.

103. This is an exceptional case entitling Polyflow to the recovery of its reasonable attorney fees.

954369.5

104.    Polyflow also is entitled to injunctive relief because there is no adequate remedy at law:   (a) Polyflow's trademark is unique and valuable property which has no readily determinable market value, (b) Defendants' infringement harms Polyflow such that Polyflow cannot be made whole by only a monetary award, (c) the public is likely to become further confused, mistaken or deceived as the source, origin, and/or authenticity of the infringing materials, and (d) upon information and belief, Defendants' conduct is continuing.

## G.    COUNT SEVEN: FEDERAL UNFAIR COMPETITION (15 USC § 1125(c)) BY DEFENDANTS

105.    Defendants' acts have diluted Polyflow's intellectual property.  These acts began with but are not limited to the submission of Polyflow's intellectual property as part of Defendants' Alabama project for Exxon.   Defendants have continued to use Polyflow information, including the registered trademark Thermoflex, in their submissions to potential customers and governmental agencies.

106.    Polyflow's intellectual property consists of a number of distinctive marks, including Polyflow's trademark for Thermoflex, that have been used for a number of years and have achieved widespread recognition.  This intellectual property is both distinctive and famous, within the meaning of Section 43(c) of the Lanham Act.

107.    Defendants' use of Polyflow's intellectual property improperly gives and gave rise to an association between Polyflow and Defendants, and is likely to and has caused actual confusion as to the source, sponsorship or affiliation of the competing companies, products, and services.  Defendants also have tarnished and diluted the Polyflow marks by their improper comparisons of their products to Polyflow's products. This is likely to cause and has caused the continuing erosion and dilution of Polyflow's intellectual property, tarnishing and degrading the

positive associations, distinctive quality, and valuable goodwill of Polyflow's intellectual property.

108.    Polyflow has been damaged by the illegal acts of Defendants, and will continue to be damaged unless and until Defendants are enjoined.

109.    Polyflow is entitled to recover: (1) the wrongfully gained profits of Defendants, (2) damages that compensate the harm suffered as a result of Defendants' illegal conduct, and (3) the costs of this action.

110.    In awarding damages, the arbitrator should treble the damage award to Polyflow because Defendants' acts were purposeful, knowing and willful.

111.    This is an exceptional case entitling Polyflow to the recovery of its reasonable attorney fees.

112.    Polyflow also is entitled to injunctive relief because there is no adequate remedy at law:   (a) Polyflow's trademark is unique and valuable property which has no readily determinable market value, (b) Defendants' infringement harms Polyflow such that Polyflow cannot be made whole by only a monetary award, (c) the public is likely to become further confused, mistaken or deceived as the source, origin, and/or authenticity of the infringing materials, and (d) upon information and belief, Defendants' conduct is continuing.

## H.    COUNT EIGHT: UNFAIR COMPETITION UNDER TEXAS LAW BY DEFENDANTS

113.    Defendants' acts and conduct, alone and/or in combination, constitute unfair competition under the laws of the State of Texas and other states in which Defendants have promoted and/or sold their products.

114.    Defendants have improperly used Polyflow's trademark and trade dress, causing confusion as to the source and/or nature and/or approval of Defendants' products and services.

954369.5

Defendants have engaged in acts and/or conduct, alone or in combination, which constitute common law or statutory unfair competition by, among other things engaging in the conduct described above and:

    a.    Defendants have provided false and/or misleading information to the marketplace and industry participants regarding the nature of their relationship to Polyflow.

    b.    Defendants have provided false and/or misleading information to the marketplace and industry participants regarding the nature of their products by providing Polyflow's products, technical information and testing data results as their own.

    c.    Defendants have provided false and/or misleading information to the marketplace and industry participants by falsely representing the terms and scope of the Settlement Agreement.

115.    Defendants' acts of unfair competition, as detailed above, have damaged and will continue to cause harm to the business and goodwill of Polyflow.

## I.    COUNT NINE: TORTIOUS INTERFERENCE WITH ACTUAL AND PROSPECTIVE BUSINESS RELATIONSHIPS BY DEFENDANTS

116.    Defendants have engaged in dishonest, unfair, and/or improper means to interfere with Polyflow's existing and prospective business relations.

117.    Defendants engaged in dishonest, unfair, and/or improper means by, among other things, engaging in the conduct described above, including but not limited to Petronas and Exxon. Defendants have continued this conduct since the Settlement Agreement with Polyflow's actual and potential customers, including by example a letter dated August 2, 2019 to Polyflow's largest customer to whom Defendants made a number of misrepresentations in attempting to improperly interfere with Polyflow's business relationship.

118.    Defendants' tortious acts, as detailed above, have damaged and will continue to cause harm to the business and goodwill of Polyflow.  Polyflow seeks its recoverable damages. Defendants' actions were intentional and willful, entitling Polyflow to actual and exemplary damages, fees, costs, and pre- and post-judgment interest.

954369.5

## IV.     PRAYER FOR RELIEF

WHEREFORE, Polyflow prays that the Court enter a final judgment against Defendants

that includes all of the following:

1.     A finding that Polyflow and Defendants have a valid arbitration agreement in the Settlement Agreement;

2.     An order compelling Defendants to arbitrate as required by the Settlement Agreement;

3.     An order designating and appointing an arbitrator to conduct the self-administered arbitration required under Polyflow's Settlement Agreement with Defendants.

4.     Actual damages for its statutory and common law causes of action.

5.     Exemplary damages.

6.     Any recoverable attorneys' fees and costs.

7.     Pre- and post-judgment interest.

8.     A preliminary and permanent injunction that prevents Defendants, and all individuals and entities acting in concert with Defendants, from violating Section 43 of the Lanham Act by:

    a.     Making false and/or misleading representations concerning the nature of their relationship to Polyflow,

    b.     Making false and/or misleading representations to the marketplace and industry participants regarding the nature of their products by providing Polyflow's technical information and testing data, or Polyflow's prior projects.

    c.     Using such testing or prior projects in commercial advertising and promotion to make false and misleading descriptions and/or representations of fact concerning the Defendants' products, history or their performance,

    d.     Engaging in a broad-based campaign that uses false or misleading descriptions of fact and/or false or misleading representations of fact as it relates to the true nature, characteristics or qualities of Polyflow's products and services.

    e.     Making false or misleading statements regarding the Settlement Agreement.

954369.5

9.    A preliminary and permanent injunction that requires Defendants, and all individuals and entities acting in concert with Defendants, to:

   a.    Provide an accounting that details sales, revenue, gross profits, and net profits secured as a result of its false advertising,

   b.    Recall and destroy any and all false and misleading advertisements or promotional materials,

   c.    Engage in an advertising and promotional campaign that corrects Defendants' false and misleading claims, and to do so, in the same manner, for the same duration and to the same extent as its false and misleading campaigns,

   d.    Directly notify each person or entity that has purchased or distributed its products of the false and misleading nature of its advertising and promotional campaign, and

   e.    Requiring Defendants to accept all returns of its products, and to compensate each customer in full for their returned purchases.

10.   An award of money damages, multiple damages, and attorney fees and costs pursuant to 15 U.S.C. § 1117.

11.   All other recoverable compensatory, as well as punitive damages.

12.   Such other relief as the arbitrator deems just and proper.

954369.5

Dated: March 20, 2020

Respectfully submitted,

SMYSER KAPLAN & VESELKA, L.L.P.

*/s/  Jeff Potts*
Jeff Potts (Attorney-in-Charge)
Texas Bar No. 00784781
Federal Bar No. 16504
Email: jpotts@skv.com
Land Murphy
Texas Bar No. 24058010
Federal Bar No. 802346
Email: lmurphy@skv.com
Austin Kreitz
Texas Bar No. 24012044
Federal Bar No. 3292473
Email: akreitz@skv.com
717 Texas Avenue, Suite 2800
Houston, Texas 77002
(713) 221-2300
(713) 221-2320 (fax)

**ATTORNEYS FOR PLAINTIFF
POLYFLOW, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing is being electronically filed and will be served on all counsel of record through the Court's electronic filing system on March 20, 2020.

*/s/ Jeff Potts*
Jeff Potts

954369.5